RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0286p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SUNNY RIDGE MINING COMPANY, INC.,

*Petitioner,*

*v.*

HERBERT KEATHLEY and DIRECTOR, OFFICE OF
WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR,

*Respondents.*

No. 14-3010

On Petition for Review of an Order
of the Benefits Review Board.
No. 13-0211 BLA.

Argued: September 30, 2014

Decided and Filed: December 4, 2014

Before: DAUGHTREY, ROGERS, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** H. Brett Stonecipher, FOGLE KELLER PURDY, Lexington, Kentucky, for Petitioner. Miller Kent Carter, CARTER & LUCAS, Pikeville, Kentucky, for Respondent Keathley. Ann Marie Scarpino, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent. **ON BRIEF:** H. Brett Stonecipher, FOGLE KELLER PURDY, Lexington, Kentucky, for Petitioner. Miller Kent Carter, CARTER & LUCAS, Pikeville, Kentucky, William L. Roberts, Pikeville, Kentucky, for Respondent Keathley. Ann Marie Scarpino, Sean G. Bajkowski, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent.

1

————————————

**OPINION**

————————————

ROGERS, Circuit Judge.  In this black lung benefits case the administrative law judge and the Benefits Review Board discounted the opinion of a doctor who, opining that pneumoconiosis had not caused Herbert Keathley's total disability, assumed that "bronchitis associated with coal dust exposure usually ceases with cessation of exposure."  The ALJ and the Board determined that this assumption was contrary to federal regulations, which state that "pneumoconiosis" may be "latent and progressive" and may arise after exposure ceases.  Sunny Ridge Mining Company challenges this determination.  Sunny Ridge also argues that the ALJ improperly weighed pulmonary function tests while determining that Keathley was totally disabled.  The grant of black lung benefits must be upheld, however, because the ALJ could properly conclude that the doctor's opinion rested on a premise inconsistent with a federal regulation and that this inconsistency warranted discrediting the doctor's opinion.

Herbert Keathley worked at strip mines for sixteen-and-a-half years.  He retired and his health deteriorated.  Believing he had pneumoconiosis attributable to his work as a coal miner, he applied for benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq.*, which provides money payments and medical benefits to coal miners totally disabled from pneumoconiosis arising from their employment in coal mines.  An ALJ denied Keathley's application for benefits, *Keathley v. Sunny Ridge*, 2009 BLA 5081 (Dep't of Labor, Nov. 18, 2010), but later the Benefits Review Board vacated the denial and remanded the case to the ALJ for further consideration of both of the issues raised on this appeal, *Keathley v. Sunny Ridge Mining Co.*, BRB No. 11-0205 BLA/A (Nov. 16, 2011) (unpub.).  On remand, the ALJ awarded benefits, *Keathley v. Sunny Ridge*, 2009 BLA 5081 (Dep't of Labor, Jan 17, 2013), and this time the Board affirmed, *Keathley v. Sunny Ridge Mining Co.*, BRB No. 13-0211 BLA (Nov. 13, 2013) (unpub.).  Sunny Ridge petitions for review of that award.

During the initial hearing, Keathley established his eligibility for benefits by triggering 30 U.S.C. § 921(c)(4)'s "fifteen-year presumption."  This presumption is triggered if the miner (1) "was employed for fifteen years or more in one or more underground coal mines" or in

surface mines with conditions "substantially similar to conditions in an underground mine" and (2) suffers from a totally disabling respiratory or pulmonary impairment[.]"   30 U.S.C. § 921(c)(4).   Proving these two conditions creates a rebuttable presumption that the miner has pneumoconiosis caused by coal mining.   Keathley proved both; he had worked in coal mines for sixteen-and-a-half years and he was able to show a totally disabling impairment through a combination of medical opinion testimony and tests showing poor pulmonary function. Keathley's pulmonary function had been tested seven times; five tests produced results indicating total disability, while two did not.   The ALJ found this preponderance of test results sufficient to establish total disability.   Once these conditions for the presumption were satisfied, it was presumed that Keathley's totally disabling pulmonary impairment was pneumoconiosis caused by coal mining.

Sunny Ridge was originally successful in rebutting this presumption by offering medical opinion evidence that Keathley did not suffer from pneumoconiosis caused by coal mine employment, in the form of testimony by Dr. Bruce Broudy.   Dr. Broudy diagnosed Keathley with "a combination of chronic obstructive asthma and pulmonary emphysema and chronic bronchitis" caused by smoking.   While Dr. Broudy conceded that "coal dust may have contributed to this gentleman's impairment," he concluded that "it's far more likely that the impairment was due to obstructive airways disease from cigarette smoking and some predisposition to asthma or bronchospasm."   When asked how he ruled out coal dust exposure as a cause, Dr. Broudy replied "coal dust exposure can cause chronic bronchitis.   But for one thing, the bronchitis associated with coal dust exposure usually ceases with cessation of exposure."   Dr. Broudy agreed that "[c]linical or medical" pneuomoconiosis can progress without further exposure, but he also agreed that "if chronic bronchitis is caused by coal dust exposure, when you remove the exposure it should dissipate[.]"   When asked whether he believed coal dust exposure was a secondary cause, Dr. Broudy stated that he "wouldn't rule it out completely as being a possible cause," but that it was not within "reasonable medical probability."   In the ALJ's 2010 decision, the ALJ found that Dr. Broudy's testimony was sufficient to rebut the presumption.   The ALJ denied Keathley's application for benefits.

On appeal, the Benefits Review Board identified two errors in the ALJ's decision: the ALJ's weighing of the pulmonary function test results was improperly based solely upon a count of the disability-indicating versus non-disability-indicating results, and the ALJ had erred in not addressing whether Dr. Broudy's reasoning for excluding coal mine dust exposure as a cause was inconsistent with the implementing regulations of the Black Lung Benefits Act. The Board vacated the ALJ's decision and remanded.

On remand, the ALJ reevaluated the pulmonary function tests. The ALJ noted that all the tests met the Department of Labor's regulatory standards and that no doctor had questioned the validity of any result. Therefore, the ALJ found that all the test results were "clearly valid representations of Keathley's pulmonary function at the time of each test." The ALJ also found that the tests, which were all taken within a seven-month period, were "sufficiently contemporaneous to provide a probative assessment." Against the argument that the pulmonary function test with the highest (and non-qualifying) value was the best because it represented peak pulmonary capacity, the ALJ concluded that all the tests conforming to the regulatory standard, where no other basis for invalidation existed, were sufficiently probative to establish total disability, and that such a blanket preference for non-qualifying values was contrary to regulations. Moreover, "on three out of four days of pulmonary testing over the course of seven months, on two of three more recent test dates, and on the most recent test day, Keathley's pulmonary function met the total disability thresholds." The ALJ concluded that all seven of the tests were "equally probative" and that because five of the "conforming, valid, and probative" tests indicated total disability, Keathley had met his burden of proof of establishing total disability.

The ALJ also reconsidered Dr. Broudy's diagnosis. The ALJ found that Dr. Broudy's diagnosis was indeed inconsistent with the regulations and discredited it. According to the ALJ, Dr. Broudy's statement—that "coal mine dust-related chronic bronchitis should dissipate with cessation of coal mine dust exposure and usually stops with exposure cessation"—was "inconsistent with the regulatory definition of pneumoconiosis in 20 C.F.R. § 718.201(c) as a latent and progressive disease that may first become detectable only after the cessation of coal mine dust exposure." Additionally, the ALJ observed "the notable absence of any explanation

by Dr. Broudy of how he specifically determined that Keathley's coal mine dust exposure played no role in his pulmonary impairment," as well as Dr. Broudy's concession that "coal mine dust may have contributed to" the impairment. The ALJ concluded that these flaws in Dr. Broudy's analysis were "significant reasoning deficiencies that diminish the probative value of his assessment to such extent that" it failed to rebut the presumption.

On appeal, the Board affirmed the ALJ's weighing of the pulmonary function tests as being based upon substantial evidence. The Board's decision in this regard consisted entirely of its rejection of Sunny Ridge's arguments for giving greater weight to the two non-qualifying tests. First, Sunny Ridge argued that the non-qualifying tests deserved greater weight because they were more recent and more reliable. The Board approved the ALJ's reliance on the lack of any evidence calling into question the reliability of any test, and the Board determined that the ALJ had permissibly concluded that the tests were equally reliable. The Board upheld the ALJ's finding that the tests established total disability as based upon substantial evidence.

The Board also affirmed the ALJ's decision to discredit Dr. Broudy's testimony as inconsistent with 20 C.F.R. § 718.201(c)'s "latent and progressive" provision. Here, the Board's reasoning was conclusory; the Board stated only that the ALJ "rationally discounted" Dr. Broudy's opinion and then affirmed the ALJ's decision.

Sunny Ridge now petitions for review. The Director of the Office of Workers' Compensation Programs has filed a brief urging denial of Sunny Ridge's petition.

The ALJ did not err by discounting Dr. Broudy's testimony for being inconsistent with 20 C.F.R. § 718.201(c). When the sole reason given for a medical opinion about the cause of pneumoconiosis conflicts with the Black Lung Benefits Act or its implementing regulations, an ALJ may discount that opinion. *See A & E Coal Co. v. Adams*, 694 F.3d 798, 802 (6th Cir. 2012); *Cumberland River Coal Co. v. Banks*, 690 F.3d 477, 488 (6th Cir. 2012); *Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 638 (6th Cir. 2009) (discussing the "hostility-to-the-Act rule"). The sole reason given by Dr. Broudy in support of his conclusion regarding the cause of Keathley's chronic bronchitis was inconsistent with federal regulations. When asked how he ruled out coal dust exposure as a cause, Dr. Broudy replied that "the bronchitis associated with coal dust exposure usually ceases with cessation of exposure." This statement conflicts with the

determination of the Department of Labor expressed in 20 C.F.R. § 718.201(c) that pneumoconiosis is "a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure."

Dr. Broudy's statement about coal mine dust-related chronic bronchitis was a statement about a form of legal pneumoconiosis. Legal pneumoconiosis is not medical pneumoconiosis; it is a legal fiction—long recognized by courts and later codified in regulations—designed to facilitate the remedial purposes of the Black Lung Benefits Act. The term goes beyond mere "clinical pneumoconiosis," which is the set of chronic lung diseases recognized by the medical community as being characterized by the permanent deposition of particulate matter in the lungs and the subsequent fibrotic reaction of the lungs. 20 C.F.R. § 718.201(a)(1). "Legal pneumoconiosis" is a broad category encompassing "*any* chronic lung disease or impairment" arising out of employment as a coal miner. 20 C.F.R. § 718.201(a)(2) (emphasis added). Chronic bronchitis, when caused by exposure to coal mine dust, is a form of legal pneumoconiosis.

Federal regulations recognize pneumoconiosis, including legal pneumoconiosis, as a latent and progressive disease that may first become detectable after cessation of coal dust exposure. This conclusion is compelled by previous decisions of this circuit. For instance, in *Cumberland River*, we upheld an ALJ's decision to discredit the testimony of a doctor who opined that the miner's chronic bronchitis was not caused by coal dust when the doctor justified that opinion by reference to the time passed since the miner's last exposure to coal dust. 690 F.3d at 487–88. These decisions are consistent with a plain reading of the regulation. Subsection (a) of 20 C.F.R. § 718.201 defines "pneumoconiosis" as "includ[ing] both medical, or 'clinical', pneumoconiosis and statutory, or 'legal', pneumoconiosis." The word "pneumoconiosis" in subsection (c) of that same section is not specifically limited to either type of pneumoconiosis. 20 C.F.R. § 718.201(c). It therefore applies to both. As the Fourth Circuit stated in *Barber v. Director, Office of Workers' Compensation Programs*, 43 F.3d 899, 901 (4th Cir. 1995), "[t]he legal definition of 'pneumoconiosis' is incorporated into every instance the word is used in the statute and regulations." Further, it is the interpretation of the Director of the Office of Workers' Compensation Programs, as expressed in his brief in this case, that the "latent

and progressive" provision applies to "legal" pneumoconiosis, and Sunny Ridge does not contest the exercise of deference usually afforded to agencies' interpretations of their own regulations. Such a conclusion may seem implausible, since it states a categorical medical claim about a category that is a legal fiction, but it is the conclusion that this court and others have reached. *E.g.*, *Midland Coal Co. v. Dir., Office of Workers' Comp. Programs*, 358 F.3d 486, 490 (7th Cir. 2004).

Sunny Ridge contends that Dr. Broudy's testimony is consistent with the regulations because the regulations nowhere state that "chronic bronchitis" is "a latent and progressive disease." But the testimony at issue was about "chronic bronchitis caused by coal dust exposure," which fits neatly within the definition of legal pneumoconiosis—as Dr. Broudy knew.[1]

The ALJ could reasonably find that Dr. Broudy's medical opinion about legal pneumoconiosis was based on a premise inconsistent with the Act. When asked how he ruled out coal dust exposure as a cause, Dr. Broudy replied that "for one thing, the bronchitis associated with coal dust exposure usually ceases with cessation of exposure." But this was not just "one thing"; it was the only thing. It was the sole reason Dr. Broudy gave for eliminating coal dust exposure as the cause of Keathley's chronic bronchitis. The ALJ considered the possibility that the statement "may have just represented a generalized comment upon which Dr. Broudy did not rely," but Dr. Broudy never disclaimed reliance on the statement and gave no other reason for ruling out coal dust exposure during the deposition. Sunny Ridge argues that the words "usually ceases with cessation of exposure," when properly read, are not inconsistent with the Act. But the ALJ's interpretation of Dr. Broudy's testimony is nonetheless supported by substantial evidence, even if there are other ways of interpreting the testimony.

Notwithstanding Sunny Ridge's alternative argument, the ALJ properly weighed the pulmonary function tests because he considered more than the mere quantitative differences in

---

[1]Dr. Broudy's knowledge of this is apparent from the transcript of his deposition: "Q[:] But legal pneumoconiosis is any condition not medical pneumoconiosis; is that right? It's any pulmonary condition caused by coal dust exposure? A[:] Well, as defined by the Statute, that's correct, yes. Q[:] So, chronic bronchitis is a condition, as I understand you're saying, that – if chronic bronchitis is caused by coal dust exposure, when you remove the exposure it should dissipate; is that right? A[:] Yes, it usually does."

the test results.  All parties agree that if the ALJ's determination was based solely upon a count of the test results, then the ALJ erred under *Woodward v. Director, Office of Workers' Compensation Programs*, 991 F.2d 314 (6th Cir. 1993).  It is unnecessary to decide whether *Woodward* should be extended to cover the evaluation of pulmonary function tests, because even if *Woodward* applies, the ALJ satisfied *Woodward*'s standard.[2]

In his 2013 decision awarding benefits, the ALJ performed a qualitative analysis of the pulmonary function tests that was sufficient under *Woodward*.  While the Benefits Review Board ruled that the ALJ's 2010 decision denying benefits "was improperly based solely upon a count of the . . . studies," the same criticism cannot be leveled against the ALJ's 2013 decision. In that decision, the ALJ determined that every test conformed to the Department of Labor's regulatory standards; that no doctor had questioned the validity of any result; that all the tests, which were taken within a seven-month period, were "sufficiently contemporaneous to provide a probative assessment"; and that tests representing peak pulmonary capacity should not be preferred because such a preference would be contrary to regulations.  Looking at the days on which the tests were performed, "on three out of four days of pulmonary testing over the course of seven months, on two of three more recent test dates, and on the most recent test day, Keathley's pulmonary function met the total disability thresholds."  The ALJ concluded that all seven of the tests were "equally probative" and that because five of the "conforming, valid, and probative" tests indicated total disability, Keathley had met his burden of proof of establishing total disability.

As the Director notes in his brief, Sunny Ridge does not challenge the ALJ's evaluation of the individual tests, identify any factor the ALJ overlooked, or offer any basis for distinguishing among the tests.  The only alternative argued by Sunny Ridge is that, if all the studies are equally probative, then the evidence is in equipoise and Keathley has failed to carry his burden of proof.  But this result is not required by *Woodward*, which contemplated the

---

[2]*Woodward* concerned the evaluation of x-rays and x-ray readings.  The parties had introduced eight different x-rays and 38 different x-ray readings.  *Woodward*, 991 F.3d at 316.  Both sides hired multiple experts and some experts read the same x-ray numerous times.  *Id.* at 320.  The ALJ found that the "voluminous readings" presented an "equivocal picture" and determined that the miner had failed to carry his burden of proof.  *Id.* at 321. The court reversed, relying in part on a provision of the Administrative Procedure Act requiring the exclusion of "unduly repetitious evidence."  5 U.S.C. § 556(d).

consideration of quantitative differences in the evidence so long as qualitative differences were also considered. *Woodward* involved an application of the Administrative Procedure Act's provision for the exclusion of "unduly repetitious" evidence, not a per se ban on using differences in the quantity of evidence to reach conclusions. *Woodward*, 991 F.2d at 321 (citing 5 U.S.C. § 556(d)). Furthermore, the evidence was not in equipoise because the ALJ found that medical opinion evidence also supported a finding of total disability. Sunny Ridge asserts that the ALJ's finding on the medical opinion evidence was predicated on his finding on the pulmonary function tests, but this is a misreading of the ALJ's decision, which states that the finding of total disability was "*further supported* by a preponderance of the probative medical opinion."

For the reasons given above, we deny the petition for review.