NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0575n.06
Case No. 17-3947

**FILED**
Nov 16, 2018
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ROBERT COAL COMPANY and OLD REPUBLIC INSURANCE COMPANY, | ) ) ) | |
| Petitioners, | ) ) | On Petition for Review of an Order of the Benefits Review |
| v. | ) ) ) | Board, United States Department of Labor |
| DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR and RICHARD CRUM, | ) ) ) ) ) | |
| Respondents. | ) ) | |

---

**BEFORE: GUY, WHITE, and STRANCH, Circuit Judges.**

**PER CURIAM.** Richard Crum is a former coal miner who suffers from a respiratory malady that completely disables him. He contends that he developed it from working in coal mines. His former employer, Robert Coal Company (or, the Company), agrees that he has a totally disabling lung condition—but it disagrees on the cause. The Company believes Crum's longstanding smoking habit caused his affliction. This case arose because Crum sought and received benefits under a federal program for miners who develop black lung disease as a consequence of their occupation. The Company challenged Crum's benefits, but Crum prevailed at the agency level. The Company appeals the final decision of the agency. For the reasons below, we AFFIRM the Board's decision.

I.

Congress passed the Black Lung Benefits Act (the Act) to provide benefits to coal miners who, through their trade, become totally disabled due to pneumoconiosis—the technical term for black lung disease. 30 U.S.C. § 901(a) (2012); *Brandywine Explosives & Supply v. Dir., OWCP*, 790 F.3d 657, 661 (6th Cir. 2015). The Act empowers the Secretary of Labor to issue regulations to effectuate its provisions. 30 U.S.C. § 936(a). The regulations provide detailed requirements that a miner must satisfy to be eligible for benefits. Under the regulations, a miner must prove four things by a preponderance of the evidence: "(1) he has pneumoconiosis; (2) his pneumoconiosis arose at least in part out of his coal mine employment; (3) he is totally disabled; and (4) the total disability is due to pneumoconiosis[.]" *Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 634 (6th Cir. 2009) (citing 20 C.F.R. §§ 718.202–204 (2000) and *Adams v. Dir., OWCP*, 886 F.2d 818, 820 (6th Cir. 1989)).

Although the Act itself simply refers to "pneumoconiosis," the regulations provide two different definitions for the term: one "clinical," the other "legal." As we have explained:

> "Clinical pneumoconiosis" refers to certain lung diseases that the medical community recognizes to be caused by exposure to coal dust—in the words of the applicable regulation, diseases "characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment." 20 C.F.R. § 718.201(a)(1). "Legal pneumoconiosis" is a broader and less definite term that refers to any chronic lung disease that was caused *in this instance* by exposure to coal dust. 20 C.F.R. § 718.201(a)(2).

*Cent. Ohio Coal Co. v. Dir., OWCP*, 762 F.3d 483, 486 (6th Cir. 2014). As its name suggests, "legal pneumoconiosis" is not a medical term, but a legal fiction "designed to facilitate the remedial purposes of the Black Lung Benefits Act." *Sunny Ridge Mining Co. v. Keathley*, 773 F.3d 734, 738 (6th Cir. 2014). A chronic lung disease constitutes legal pneumoconiosis only if it is "significantly related to, or substantially aggravated by, dust exposure in coal mine employment."

20 C.F.R. § 718.201(b) (2018). A miner may receive benefits if he suffers from either clinical or legal pneumoconiosis. *Id*. § 718.201(a).

## II.

Around 1973, at about age 19, Crum became both a cigarette smoker and a coal miner. His coal-mine employment was sporadic and he worked for various companies including Robert Coal. All told, he spent 8.62 years working in coal mines, eventually putting in his last day in 1983. His smoking habit lasted much longer. Although the evidence of Crum's smoking history varies widely, Crum seems to have smoked around half of a pack each day until the year 2000, at which point he cut back a bit. Ultimately, the ALJ found that by 2015, Crum had accumulated "at least 10 pack-years[1] of smoking and continue[d] to smoke several cigarettes per day."

Crum filed for benefits in September 2010—27 years after his last stint in the mines. The District Director issued a proposed decision and award of benefits to Crum, which led the Company to request a hearing before an ALJ. The ALJ held a hearing in November 2014, and in June 2015 he issued a decision granting Crum benefits. The Company appealed, but a panel of the Benefits Review Board affirmed the ALJ's decision the following May. When the Review Board subsequently denied the Company's motion for reconsideration on July 12, 2017, the decision became final and the Company filed the instant appeal.

## III.

We review the Benefits Review Board's legal conclusions de novo and we must affirm its decision "if the Board has not committed any legal error or exceeded its statutory scope of review of the ALJ's factual determinations[.]" *Morrison v. Tenn. Consol. Coal Co.*, 644 F.3d 473, 477–78 (6th Cir. 2011) (quoting *Jonida Trucking, Inc. v. Hunt*, 124 F.3d 739, 742 (6th Cir. 1997)). Our

---

[1] One "pack-year" is equivalent to smoking one pack of cigarettes each day for one year. Thus, a person who smoked half of a pack every day for four years would rack up two pack-years.

review therefore focuses on "whether the ALJ—not the Board—had substantial evidence upon which to base his . . . decision." *Id.* (quoting *Jonida Trucking*, 124 F.3d at 742). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1068–69 (6th Cir. 2013) (quoting *Kolesar v. Youghiogheny & Ohio Coal Co.*, 760 F.2d 728, 729 (6th Cir. 1985)).

IV.

Over the course of Crum's pursuit of benefits, he routinely underwent three procedures often used by doctors to diagnose respiratory problems: x-rays, pulmonary function tests (PFTs), and arterial blood gas studies (ABGs). All three of the procedures are permissible forms of objective medical evidence under the regulations, but they measure different things. *See* 20 C.F.R. § 718.202(a)(1), (4). X-rays are used to identify specific obstructions in the lungs, while PFTs and ABGs measure lungs' performance. *The Merck Manual of Diagnosis and Therapy* 521–25, 528, 532–33 (Mark H. Beers, M.D., et al. eds., 17th ed. 1999). Specifically, a PFT measures how well a person can exhale—thereby revealing the severity of airway obstruction—while an ABG measures how well gases are being exchanged between the lungs and blood. *Id.* at 522–23, 528. PFTs and ABGs produce numeric values (e.g., an $FEV_1/FVC$ ratio of 55), and by comparing those numbers to tables promulgated by the Department of Labor, one can determine whether a person is "totally disabled." 20 C.F.R. § 718.204(b)(2). When a PFT or ABG suggests a person is totally disabled, the test is said to be "qualifying." *See Crockett Colleries, Inc. v. Barrett*, 478 F.3d 350, 356–57 (6th Cir. 2007). In contrast, x-rays are pictorial and must therefore be interpreted by experts, called "B-readers." *See* 20 C.F.R. § 718.102(e). A B-reader can study an x-ray, determine the types of obstructions and then, with varying confidence, conclude whether a person has clinical pneumoconiosis. *Id.* § 718.102(e)(2)(iii).

All told, Crum underwent five x-rays, four PFTs, and four ABGs. Every PFT Crum underwent was qualifying, but only half of the ABGs were. Even so, all the doctors—and consequently the ALJ—concluded that Crum's respiratory condition is totally disabling and no one disputes this on appeal. The x-ray results were also mixed. Every B-reader who looked at Crum's first three x-rays read them as negative for clinical pneumoconiosis. Dr. Alexander was the first B-reader to read Crum's final two x-rays (both taken in 2012) and he read them as positive for clinical pneumoconiosis. But when another B-reader, Dr. Tarver, reviewed them, he read them as negative for clinical pneumoconiosis.

Section 718.202 allows an ALJ to find the existence of pneumoconiosis by relying on x-rays, biopsies or autopsies, a presumption, or a determination made by a physician. 20 C.F.R. § 718.202. The ALJ in this case relied on the fourth option: physicians' reports. There are requirements for these types of physicians' findings. The physician must have reached the determination by "exercising sound medical judgment," and any finding of pneumoconiosis "must be based on objective medical evidence such as blood-gas studies, electrocardiograms, pulmonary function studies, physical performance tests, physical examination, and medical and work histories. Such a finding must be supported by a reasoned medical opinion." *Id*. § 718.202(a)(4).

The ALJ first considered whether Crum has clinical pneumoconiosis by reviewing the reports of the five doctors who saw him. Dr. Ammisetty made no findings about clinical pneumoconiosis so the ALJ gave little weight to his opinion on the issue. Drs. Gallai and Klayton diagnosed Crum with clinical pneumoconiosis, but the ALJ pointed out that both of them simply relied on positive x-ray readings made by others, so they were entitled to little weight. In contrast, the other two doctors—Rosenberg and Jarboe—went beyond the x-rays in reaching their conclusions that Crum does not have clinical pneumoconiosis. The ALJ therefore gave Dr.

Rosenberg's and Dr. Jarboe's opinions full probative weight and found that Crum does not have clinical pneumoconiosis. No one challenges this finding on appeal.

The ALJ next turned to legal pneumoconiosis. Here, he reached the opposite conclusion. After reviewing all the doctors' reports and depositions, the ALJ assigned full probative weight to portions of the reports of Drs. Ammisetty, Gallai, and Klayton, while giving little weight to Dr. Rosenberg's and Dr. Jarboe's opinions. Consequently, the ALJ found that Crum has legal pneumoconiosis.

V.

The Company argues that the ALJ erred in finding Crum had legal pneumoconiosis because the conclusions of Drs. Ammisetty, Klayton, and Gallai were not based on any scientifically reliable methodology. According to the Company, none of the doctors' opinions used objective medical evidence to connect Crum's coal exposure as a cause of his condition and are thus not "competent evidence" under 20 C.F.R. § 718.203(c).

The Director[2] does not precisely disagree. At the outset of her response brief, the Director confined her argument to two legal issues: (1) whether an ALJ may credit doctors' opinions when they are unable to apportion causation between coal-mine work and smoking, and (2) whether an ALJ may discredit doctors' opinions because they are premised on beliefs contrary to the Act's preamble. Neither issue, however, addresses the initial question: whether there was any evidence that coal-mine work in any way caused Crum's condition to begin with. Even so, the Director avers that while a medical opinion can be credited only if it is "reasoned and documented," the decision to credit a medical opinion that lacks an articulate rationale is a credibility matter left to the ALJ's discretion. In support of this proposition, the Director relies on two of our prior

---

[2] Under the Act, the Director, Office of Workers' Compensation Programs, is the Secretary of Labor's designee in reviews that come before a United States Court of Appeals. 20 C.F.R. § 802.410(b).

decisions: *Wolf Creek Collieries v. Director, OWCP*, 298 F.3d 511 (6th Cir. 2002) and *Peabody Coal Co. v. Groves*, 277 F.3d 829 (6th Cir. 2002). Some clarification of these and other precedents is in order.

Thirty-five years ago, we vacated a judgment of the Benefits Review Board and remanded the case to the Board for further proceedings after somewhat irregular agency proceedings. *See Dir., OWCP v. Rowe*, 710 F.2d 251, 256 (6th Cir. 1983). The claimant miner was examined by two doctors. Both diagnosed him with pneumoconiosis, but only one concluded that he was totally disabled; the other doctor did not mention his level of disability one way or another. *Id.* at 253–54. The ALJ found that the miner was totally disabled based solely on the doctor who did not opine on the miner's disability and failed to even mention the other doctor or his report. On appeal, the Board recognized that the ALJ's opinion was insufficient, but instead of remanding the case, the Board affirmed the award of benefits because the unmentioned doctor's report "was a documented and reasoned medical opinion" in satisfaction of the relevant regulation. *Id.* at 254. We vacated the Board's judgment because "the proper course for the Board [was] to remand the case to the ALJ[.]" *Id.* at 255. We explained that the "determination as to whether [the unmentioned doctor's] report was sufficiently documented and reasoned is essentially a credibility matter. As such, it is for the factfinder to decide." *Id.* We then went on:

> [T]he mere fact that an opinion is asserted to be based upon medical studies cannot by itself establish as a matter of law that it is documented and reasoned. Rather, that determination requires the factfinder to examine the validity of the reasoning of a medical opinion in light of the studies conducted and the objective indications upon which the medical opinion or conclusion is based. Of course, the factfinder should also consider any contrary test results or diagnosis in reaching a decision as to whether a statutory presumption applies and ultimately whether the claimant is totally disabled.

*Id.* at 255 (footnote omitted).

The portion of our holding in *Rowe* about credibility determinations has been regularly cited since then, whether directly or through a chain of reliant citations. *See, e.g.*, *Ogle*, 737 F.3d at 1073; *Tenn. Consol. Coal Co. v. Crisp*, 866 F.2d 179, 184–85 (6th Cir. 1989); *Moseley v. Peabody Coal Co.*, 769 F.2d 357, 360 (6th Cir. 1985). Both *Wolf Creek Colleries* and *Groves* relied on the passage from *Rowe*. *See Wolf Creek Colleries*, 298 F.3d at 522; *Groves*, 277 F.3d at 836. We have applied the *Rowe* holding to differing facts and through varied phrasing. *See, e.g.*, *Advent Mining LLC v. Davis*, 697 F. App'x 862, 865 (6th Cir. 2017); *Williams v. Eastover Mining Co.*, 335 F. App'x 577, 579–80 (6th Cir. 2009); *Johnson Coal Co. v. Smith*, 306 F. App'x 223, 224 (6th Cir. 2009); *Cumberland River Coal Co. v. Caudill*, 207 F. App'x 529, 532 (6th Cir. 2006). As a result, the operation of the rule itself can be easily misconstrued. The *Rowe* holding therefore bears clarifying.

Our review, first and foremost, is rooted in the laws that bind us—namely, the Act and its attendant regulations. On the matter of evidence, the regulation is clear: if a determination of legal pneumoconiosis is based on a physician's finding, the physician's finding "must be based on objective medical evidence such as blood-gas studies, electrocardiograms, pulmonary function studies, physical performance tests, physical examination, and medical and work histories" and it "must be supported by a reasoned medical opinion." 20 C.F.R. § 718.202(a)(4). On causation, the standard is "competent evidence." *Id*. § 718.203(c). Of course, sometimes two qualified physicians will look at the same objective medical evidence and arrive at different conclusions. In these cases, the ALJ will have to make credibility determinations and we defer to those determinations on review. *See Crisp*, 866 F.2d at 184–85. But under the terms of § 718.202(a)(4), for instance, an ALJ cannot base a finding of legal pneumoconiosis solely on a physician's finding that is not itself based on objective medical evidence and supported by a reasoned medical opinion.

*Accord Littlepage v. Dir., OWCP*, 890 F.2d 416 (6th Cir. 1989) (Table) ("A physician's opinion must be documented and reasoned to constitute substantial evidence in support of a finding.") (citing *Rowe*, 710 F.2d at 255); *Dir., OWCP v. Congleton*, 743 F.2d 428, 430 (6th Cir. 1984) (recognizing that the reviewing court need not defer to the ALJ's determination when "the evidence presented was simply too vague and conflicting to support the decision" as explained by the ALJ). If an ALJ does so, his decision is not based on substantial evidence, contradicts the requirements of the regulations, and warrants a remand, not deference.

This is fully consistent with *Rowe* and its progeny. The refrain of the cases has been that the sufficiency of a physician's documentation or reasoning is a credibility matter left to the ALJ. This is a separate question from whether the physician began with the minimum raw materials demanded by § 718.202(a)(4), § 718.203(c), or any other provision. An ALJ's decision must be supported by substantial evidence and the regulations define what is required. The regulations cannot be bypassed simply because an ALJ credited a physician's demonstrably unsupported opinion. With this clarification in mind, we evaluate the ALJ's findings and the doctors' opinions that undergird them.

Crum saw Dr. Ammisetty first. At the time of the examination, Crum had received one x-ray, two ABGs, and one PFT. Dr. Ammisetty reviewed the results of the tests and personally examined Crum. He diagnosed Crum with severe chronic obstructive pulmonary disease (COPD), bronchial asthma, cor pulmonale, and legal pneumoconiosis. Ultimately, the ALJ found that the COPD diagnosis was well-reasoned and documented, but the bronchial asthma and legal pneumoconiosis diagnoses were not. The ALJ pointed out that Dr. Ammisetty's formal diagnosis of legal pneumoconiosis was apparently based on nothing more than Crum's symptoms and thus found it not well-reasoned. Similarly, the ALJ found that the bronchial asthma diagnosis was

based only on Crum's reported history and was therefore unreasoned and entitled to little weight. The COPD diagnosis, however, was well-reasoned, according to the ALJ. He explained that Dr. Ammisetty's finding was based on "both objective medical evidence as well as [Crum's] smoking and coal dust history[.]" And because COPD can fall within the definition of legal pneumoconiosis, the ALJ gave that portion of the report full probative weight.

Crum saw Dr. Gallai a little more than a year after the Ammisetty exam. In the interim, Crum had received two more x-rays (both negative for clinical pneumoconiosis), another ABG (non-qualifying), and another PFT (qualifying). On the day Dr. Gallai examined him, Crum also underwent another ABG, PFT, and x-ray. Dr. Gallai diagnosed Crum with hypoxia, bronchitis, and COPD. Hypoxia is not necessarily a chronic lung disease, so the ALJ found it inadequate to constitute legal pneumoconiosis under § 718.201(a)(2). And the ALJ determined that the bronchitis diagnosis was based only on Crum's reported history and symptoms, so it did not pass muster under § 718.202(a)(4). The ALJ found, however, that the COPD diagnosis was based on Crum's reported symptoms, work and smoking histories, an x-ray, an ABG, and a PFT. Accordingly, the ALJ found this portion of the report well-reasoned and documented and gave it full probative weight.

A month after the Gallai exam, Crum saw Dr. Klayton. He underwent three final tests that day: an x-ray, an ABG, and a PFT. Dr. Klayton formally diagnosed Crum with legal pneumoconiosis, but the constituent conditions of the diagnosis were COPD and hypoxemia. Ultimately, the ALJ gave Dr. Klayton's opinion full probative weight based on the COPD finding.

As the foregoing attests, there was substantial evidence to support a finding that Crum has COPD. And there is no question that COPD *can* constitute legal pneumoconiosis. When coal-mine employment contributed "at least in part" to a miner's COPD, then the COPD is properly

considered pneumoconiosis. *See Arch on the Green, Inc. v. Groves*, 761 F.3d 594, 597–98 (2014). But the regulations require the factfinder to make this additional causal connection between coal mining and the COPD, and that inquiry is governed by § 718.203.

The ALJ made such a finding, albeit in a roundabout fashion. After finding that Crum had adequately proven that he suffers from legal pneumoconiosis under § 718.202(a)(4), the ALJ declined to make an additional causation finding. He explained:

> The Act and the regulations provide for a rebuttable presumption that pneumoconiosis arose out of coal mine employment if a miner with pneumoconiosis was employed in the mines for ten or more years. 30 U.S.C. § 921(c)(1); § 718.203(b). In *Kiser v. L & J Equipment Co.*, 23 B.L.R. 1-246, 1-259 n. 18 (2006), the Board cited to *Anderson v. Director, OWCP*, 455 F. 3d 1102 (10th Cir. 2006) and *Henley v. Cowan & Co.*, 21 B.L.R. 1-147, 1-151 (1999) and agreed with the Director's position that, if an ALJ finds the existence of legal pneumoconiosis, then he or she need not separately determine the etiology of the disease at § 718.203 because the findings at § 718.202(a)(4) will necessarily subsume that inquiry. Therefore, because I have found that Claimant has established legal pneumoconiosis, a separate finding, under § 718.203, is unnecessary in this case.

We disagree with the ALJ: a causation finding under the strictures of § 718.203 is necessary because § 718.202(a)(4) does not address causation, it simply defines the types of evidence necessary to find the existence of pneumoconiosis.[3] Nevertheless, the ALJ made causation findings while discussing § 718.202(a)(4). We therefore analyze those findings to determine whether they constitute "competent evidence" under § 718.203(c).

---

[3] There is an admitted incongruity in the phrasing of the regulations. Section 718.201(a) limits pneumoconiosis to diseases arising out of coal mine employment. So, in one reading of the text, if an ALJ finds the existence of pneumoconiosis under § 718.202, she has *de facto* found that the condition arose from the miner's coal-mine employment, in satisfaction of § 718.203. Such a reading, however, would render § 718.203's requirement that the condition arise "at least in part" out of coal-mine employment mere surplusage and we have rejected it. *See Arch on the Green, Inc.*, 761 F.3d at 598. Nevertheless, this court has referred to the two causation standards interchangeably, and we have held that a claimant can prove his COPD was "significantly related to, or [substantially] aggravated by," exposure to coal dust by showing that his disease was "caused [at least] in part" by coal-mine employment. *Id*. at 598–99.

*Dr. Ammisetty's report.* Dr. Ammisetty concluded that Crum's pulmonary condition is principally due to his smoking, but "coal dust exposure significantly exacerbated the symptoms." Yet there was nothing to support this conclusion. He was not a B-reader and conceded that the x-ray "was negative for coal molecules," but nevertheless speculated that aspects of the x-ray "could be due to pneumoconiosis." He noted that he partially based his diagnosis of legal pneumoconiosis on the PFT results, but his discussion is devoted to linking the results with smoking, not coal dust. And notably, he was under the impression that Crum had entirely ceased smoking ten years earlier, when in fact he had not. His report does not, therefore, support a causation finding.

*Dr. Klayton's report.* Although Dr. Klayton's COPD diagnosis was well-documented, his opinion on causation was considerably briefer. The etiology section read simply: "Coal dust exposure and smoking. I cannot state the relative contributions of each, but smoking does not cause the changes seen on chest x-ray." Notably though, Dr. Klayton is not a B-reader and he explained in his deposition that he did not "attempt to read" the x-ray, but simply looked at it to "get a gestalt for what it looks like," and then waited for the B-reader report. And the B-reader report he did rely on was ultimately discredited by the ALJ. Moreover, Dr. Klayton based his report on a work history of 10 years (which was too high) and a smoking history of 7.5 pack-years (which was too low).

Some of this was cleared up during Dr. Klayton's deposition. He was asked if his opinion would change if the evidence was actually a negative x-ray, seven years of coal-dust exposure, and 10 pack-years of smoking. Dr. Klayton affirmed that his opinion would be the same because in his medical opinion one can never exclude coal dust as a contributing factor when the patient worked in a coal mine.

Dr. Klayton's opinion may be medically defensible, but it conflicts with the evidentiary demands of the Act and regulations. Congress decided that, for the purpose of benefits, coal dust is presumed to be a cause of a miner's lung condition only if the miner was employed for ten years or more. 30 U.S.C. § 921(c)(1); *see also* 20 C.F.R. § 718.203(b). If the miner worked for a shorter period, "competent evidence" must establish a causal connection. 20 C.F.R. § 718.203(c). When other factors like smoking are present, causal opinions based solely on a miner's work history cannot constitute competent evidence because they directly conflict with a policy determination already made by Congress. Dr. Klayton's report does not, therefore, support a causation finding.

*Dr. Gallai's report.* The causation discussion in Dr. Gallai's report was, like Dr. Klayton's, quite brief. It mostly discussed Crum's reported—and ultimately inaccurate—smoking history. Dr. Gallai explained that, "[f]ive years ago [Crum] could walk a mile, three years ago he could walk a half a mile and currently he can just walk across the room." Dr. Gallai thought that Crum had essentially stopped smoking ten years earlier, so he surmised that this decline was most consistent with coal-dust exposure. Crum, however, had not quit smoking. The ALJ reasoned that this was of no moment because Dr. Gallai later "testified that his diagnosis of pneumoconiosis would not change if [Crum] had continued to smoke actively."

We agree with the ALJ. Dr. Gallai explained that an accurate smoking history would change his opinion only "somewhat" and that while coal-dust exposure "may not have been the majority" cause of Crum's condition, he continued to believe that it substantially contributed to it. Under the regulations, coal dust need not be the majority cause—just a contributing factor. *See Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 634 (6th Cir. 2009). For example, in a case where a coal company was required to disprove causation, we held that the ALJ permissibly relied on a medical opinion that stated "[t]here is no way . . . by which a distinction can be made

between the identical forms of COPD caused by smoking and coal mine dust," and so concluded that "both smoking and mine dust are important contributing causes of [the claimant's] chronic lung disease." *Island Creek Ky. Mining v. Ramage*, 737 F.3d 1050, 1060 (6th Cir. 2013). Here, when Dr. Gallai was asked whether 10 to 12 pack-years of smoking could cause PFT scores as low as Crum's, Dr. Gallai answered, "[i]n general, definitely not." Dr. Gallai thus stood by his conclusion even when given more accurate information and the ALJ found that, on balance, Dr. Gallai's report and subsequent explanation of it supported a causation finding. The finding is based upon substantial evidence and therefore we do not disturb it.

In sum, the three doctors' findings were enough to show that Crum suffers from an acute lung condition (in satisfaction of § 718.202(a)(4)) and Dr. Gallai's report and testimony were enough to show that Crum's coal-mine employment was a cause of that condition (in satisfaction of § 718.203(c)). If there was no further evidence, our inquiry would end, and we would be compelled to affirm. The Company, however, insists that other evidence discredited by the ALJ compels another result.

The Company argues that the ALJ erred by using the preamble to the Act to "discredit competent evidence" provided by Drs. Rosenberg and Jarboe. We have encountered this argument before. In *Central Ohio Coal Co. v. Director, OWCP*, the same Dr. Rosenberg provided testimony similar to the opinions he provided here. 762 F.3d at 491–92. There, as here, Dr. Rosenberg concluded that the miners' PFT results were consistent with smoking-induced COPD but inconsistent with COPD caused by coal dust. We explained that "Dr. Rosenberg may be right as a matter of scientific fact, but his analysis plainly contradicts the DOL's position that COPD caused by coal-dust exposure may be associated with decrements in the $FEV_1/FVC$ ratio." *Id.* at 491. We stated "unequivocally" that "the ALJ was entitled to discredit Dr. Rosenberg's medical opinion

because it was inconsistent with the DOL position set forth in the preamble[.]" *Id.* at 491–92. The result is no different here. The ALJ did not err in discrediting Dr. Rosenberg's opinion. Nor did he err in discrediting Dr. Jarboe's opinion, which similarly contradicted the DOL's positions on FEV values and latent onset of legal pneumoconiosis.

VI.

For the foregoing reasons, the decision of the Board is AFFIRMED.